George Gardiner GREEN and Eleanor T. Green, Plaintiffs-Appellants-Cross Appellees,

v.

UNITED STATES of America, Defendant-Appellee-Cross Appellant.

No. 71–1482.

United States Court of Appeals, Fifth Circuit.

May 17, 1972.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Meyer Rothwacks, Paul M. Ginsburg, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

James P. Knight, Jr., Jackson, Miss., for plaintiffs-appellants.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

On this appeal, the taxpayer and the government dispute the federal tax consequences of an offer by a closely-held corporation to sell mineral interests to its shareholders for a price which the Government contends was less than fair market value. Each party protests the

lower court's disposition of one aspect of the case. We sustain both appeals.

Plaintiff George Gardiner Green and his wife, Eleanor T. Green, sued the Commissioner for a refund of taxes paid on an alleged constructive dividend arising when remainder interests of the Central Oil Co. [Central] in the Raleigh and Citronelle Oil fields of Mississippi and Alabama were sold during 1965 to shareholders and non-shareholders of Central.[1] The corporation conveyed to the purchasers an undivided remainder interest in the Raleigh and Citronelle mineral properties for a total consideration, from all purchasers, of $210,000. Central offered its shareholders the opportunity to purchase remainder interests in proportion to their holdings in Central. Eleanor T. Green owned 245 shares of stock in Central, or 2.83795% of the outstanding shares; she purchased 2.83975% of the remainder interests sold.

George Gardiner Green [Green] was a director and the president of Central on December 1, 1965, the date when the mineral interests in question were sold. He owned 682½ shares of the total 8333 outstanding shares held by approximately 22 shareholders, or 7.90571% of the stock of Central. Green did not himself purchase his pro-rata portion of the Citronelle and Raleigh mineral interests. Instead, his adult son, George Gardiner Green, Jr., and two trusts for the benefit of his minor children, Kelsey A. Green and W. T. Green, purchased 7.90571% of the remainder interests sold by Central.

The parties stipulated that a sale of corporate property to a shareholder for less than the fair market value of the property sold constitutes a dividend to the shareholder-purchaser, to the extent of the difference, provided there are qualified earnings and profits from which the dividend may be paid. Two questions, however, divided the parties below and continue to divide them on this appeal. The first question is whether, in the jury trial below, the district court properly allowed the jury to value the mineral interests sold by Central to its shareholders and others.[2] The second question is whether the district court was correct when it concluded as a matter of law that the sale by Central to Green's children did not constitute a constructive dividend to Green himself.

## A. Valuation

On January 20, 1960, the Commissioner adopted regulations governing the valuation of mineral interests for purposes of sections 611–613, 615, 616 and 621 of the Internal Revenue Code of 1954. These regulations provide, in pertinent part:

§ 1.611–2 *Rules applicable to mines, oil and gas wells, and other natural deposits:*

\* \* \* \* \* \*

(d) *Determination of fair market value of mineral properties, and improvements, if any.* (1) If the fair market value of the mineral property and improvements at a specified date is to be determined for the purpose of ascertaining the basis, such value must be determined, subject to approval or revision by the district director, by the owner of such property and improvements in the light of the conditions and circumstances known at that date, regardless of later discoveries or developments or subsequent improvements in methods of extraction and treatment of the mineral product. The district director will give due weight and consideration to any and all factors and evidence having a bearing on the market value,

---

1. The sale constituted the first part of an "ABC Transaction", the details of which are not relevant to this appeal.

2. This issue must be resolved regardless of the disposition of the second issue in the case because Mrs. Green was an acknowledged recipient of a dividend should the fair market value of the interests sold exceed the sale price.

such as cost, actual sales and transfers of similar properties and improvements, bona fide offers, market value of stock or shares, royalties and rentals, valuation for local or State taxation, partnership accountings, records of litigation in which the value of the property and improvements was in question, the amount at which the property and improvements may have been inventoried or appraised in probate or similar proceedings, and disinterested appraisals by approved methods.

(2) If the fair market value must be ascertained as of a certain date, analytical appraisal methods of valuation, such as the present value method will not be used:

(i) If the value of a mineral property and improvements, if any, can be determined upon the basis of cost or comparative values and replacement value of equipment, or

(ii) If the fair market value can reasonably be determined by any other method.

\* \* \* \* \* \*

The Government concedes that "the purpose of this regulation is to demonstrate a preference for appraisal methods based on actual costs and comparative sales over the relatively speculative analytical appraisal methods, which rely on estimates of the future income production of a mineral deposit in order to reach a determination as to the property's present worth."

At trial, the taxpayers introduced evidence of other sales of interests in the Citronelle and Raleigh fields.[3] Taxpayers also introduced testimony that sales of undivided mineral interests are subject to accurate valuation on a simple, pro rata basis, much like holdings of shares of a large corporation. The Government's chief appraisal expert, Oldham, disputed the comparability of the other sales put in evidence by the taxpayers. He denied that his own prior estate tax appraisal of an interest in the same properties had been conducted with care sufficient to warrant reliance on this occasion as well. Oldham testified that he would value the mineral interests in dispute by means of the present value, or analytical method, since no other approach would, in his opinion, be reliable. Oldham's analytical appraisal valued the remainder interests alone at $1,380,389—$1,170,389 more than the total price exacted from Central's purchasers.

At the conclusion of the evidence, then, there was conflicting testimony before the jury on the question of valuation. The district court allowed the question of proper valuation to be submitted to the jury on a generalized instruction. The court defined fair market value; stated that the taxpayer had the burden of proving the Commissioner's determination incorrect by a preponderance of the evidence; told the jury it could consider book value and the opinion of experts; and—in an apparent bow to the Regulations—instructed that "comparable sales are usually the most reliable evidence and in any case they should be weighed heavily."

This instruction failed to give adequate recognition to the Commission-

---

3. Plaintiffs offered evidence of five previous Citronelle sales in their exhibits P–2 through P–6. The sales were apparently sales of undivided possessory interests in the Citronelle field, as distinguished from the sales by Central to Mrs. Green and the Green children, which were sales of remainder interests only. The amounts of the prior sales were $556,000; $295,812; $393,000; $555,000; and $476,900, for an average price of $453,342, reduced for comparison to a one per cent interest. A one percent interest at the price of the Central Oil sale, including the entire ABC Transaction and not just the remainder interest alone, was $536,900.

As the district court stated, "There was only evidence of one sale of an interest in the Raleigh Field, from Humble Oil and Refining Company to the California Company on April 1, 1963, and conversion of this interest sold at the price paid, to the price for Central's interest, yields a selling price of $904,461 as compared to Central's selling price two years and eight months later for $875,000.00".

er's own regulations.[4] The instruction allowed the jury to decide whether, considering all the testimony concerning both methods of appraisal, it considered the analytical method more reliable than the "comparative sales" method suggested by the taxpayers' evidence. The plain implication of the Regulations is that the comparative value method must be used if the value of a mineral interest can reasonably be determined through comparative valuation. Only if comparative valuation is not reasonably reliable for a particular property is the analytical method to be invoked. This means that the trier of fact must first decide that comparative valuation is not reasonably reliable before the trier is permitted to consider the analytical method.

The instruction and procedure followed by the district court in the present case is defective because it permits the jury to conclude that comparative value is a reasonable method of appraisal and yet to reject comparative value as a means of determining the value of a mineral interest. Either out of bewilderment, which may have prevailed below,[5] or out of conviction, the trier may decide to adhere to the analytical method because the trier believes that the analytical method is the more reasonable of two reasonable means of evaluation. This compromise or this choice by the trier of fact has the effect of wiping out the preference for the comparative value methods required by the Commissioner's regulations.

---

4. It is well settled that Treasury regulations are binding on the Government as well as on the taxpayer. E. g., Brafman v. United States, 5 Cir. 1967, 384 F.2d 863, 866. Moreover, regulations long continued without substantial change are considered to have received Congressional approval and have the force of law. United States v. Correll, 1967, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537. Although there is no precise cut-off point when a regulation achieves sufficient venerability to warrant recognition, we have no trouble concluding that the regulation before us must govern the valuation of the remainder interests sold by Central Oil Company. The regulation was promulgated in 1960, has survived a major tax reform act which focused considerable attention on mineral income taxation, and, in any event, we do not understand the Government to contest the applicability of the regulation.

Concluding as we do that the regulation on valuation was not followed in the district court, we have considered the taxpayers' argument that the Commissioner's action must be "struck down" for failure to apply his own regulations. Apparently, the taxpayers ask us to punish the Commissioner by forbidding him from placing any valuation at all on the remainder interests sold by Central to Mrs. Green, to George Gardiner Green, Jr., and to trusts created for the other two Green children. The argument is wholly without merit. The application of the Internal Revenue Code, and of the regulations promulgated in accordance with it,

is a task of infinite complexity. When the Commissioner goes astray himself and even when he leads the federal district court with him, our own responsibility requires us to establish what we think Congress has intended to require or what the Commissioner's regulations imply. If the Commissioner or the district court has erred, we try to provide for a correct computation of tax liability or for such proceedings as may result in a correct computation. The determination of federal tax liability is not a game of chance providing the victim of an incorrect assessment with the windfall of no taxation at all. We need not consider the proper remedy for bad faith enforcement of the tax laws or regulations by the Commissioner, for there is not the slightest suggestion of misconduct in this record. Nor need we consider the impact of the Commissioner's failure to follow his own procedural regulations, and the impact of such failure upon related criminal proceedings. See United States v. Heffner, 4 Cir. 1969, 420 F.2d 809.

5. The total consideration paid to Central for the remainder interests was $210,000. The government contended that the fair market value of the remainder interests exceeded the $210,000 price by $1,170,389. The jury found that the total value of the remainder interests exceeded the purchase price by $375,194, thus giving a valuation for the remainder interests of $585,194—half the amount of the excess value contended for by the Government.

On the record before us, we cannot determine the appropriateness of the comparative sales method of valuing the Citronelle mineral interests sold by Central Oil. Oldham testified that "in this type of transaction, a lot of times, especially major oil companies, they will trade properties . . . so the consideration mentioned in the transaction may not reflect anything close to the market value". But the district court reviewed the evidence and stated that "[t]here was no evidence that any of these sales was anything other than an arms-length transaction between individuals and companies completely knowledgeable in the oil business". This statement by the district court constitutes an implicit conclusion of law that the sales offered into evidence by the taxpayers could not have been found non-comparable on this record, on the basis of the identity of the various buyers and sellers of previous Citronelle interests. From our study of the record, we agree with the district court's analysis of the evidence as to the identity of previous Citronelle buyers and sellers; there is no need to reopen that particular inquiry into the comparability of previous sales.

■■  But the lower court has left us at sea with regard to another determinant of comparability put in issue by the evidence. The taxpayers' evidence indicated that the smaller size of the previous Citronelle sales was no reason to doubt their comparability; Oldham, though not very plainly, disputed this evidence. The jury was never given a chance to determine, from the conflicting testimony, whether disparate size did render the prior sales non-comparable to the sales by Central Oil. And the court's memorandum opinion does not settle the

question as it settles the issue of the previous buyers' and sellers' identity. There must, then, be a new trial to determine the comparability of the previous Citronelle sales as a basis for valuation.[6] The taxpayers have never really had their day in court on the issue of valuation, as it must be determined in accordance with the Commissioner's regulations.

■  Similarly, there must be further proceedings below to determine the proper valuation of the Raleigh field interests sold by Central. Only a single sale of a Raleigh interest was introduced into evidence by the taxpayers. The single sale offered into evidence was one involving two oil companies. It was therefore arguably subject to the defect of not being at arm's length, as Oldham suggested in his testimony in general terms. This determinant of reliability, as well as size, must be left to the trier to resolve if there is a genuine conflict in the evidence. Our reading of the evidence in the record suggests that such a conflict was at stake over the Raleigh interests, and the district court gave no hint of resolving the conflict in its opinion. There must, then, be further proceedings with regard to the reliability of the prior Raleigh sales as well as the prior Citronelle sales.

■  To summarize: the Commissioner's regulations on valuation of mineral properties require a two-part determination of fact. First, the trier must determine whether any of the available appraisal methods other than analytical methods are reasonably reliable in all the circumstances of a particular property. This determination may require preliminary determinations of fact, such as the comparability of size and the comparability of principals,

6. We have spoken only of comparable sales, but as the Regulations make clear, similar considerations apply to comparable appraisals. Thus, on remand, the trier of fact must be given the opportunity to decide whether the valuation by Oldham of the Citronelle and Raleigh interests of Jane R. Hynson were reasonably reliable before the trier is afforded the chance to consider the analytical method of appraisal. Only if the trier decides that both the prior sales and the prior appraisal provide no reasonably reliable guide to valuation of these mineral interests may the trier pass to consideration of the analytical appraisal methods.

subject always to the court's power to withdraw such determinations from the jury when the evidence suggests but one conclusion.[7]  Second, the trier of fact must be allowed to determine the value of a property in accordance with the method chosen above.  If the jury concludes that comparative sales are reasonably reliable, then it must be instructed to value the property exclusively on the basis of such sales.  If it concludes that comparative sales or appraisals are not reliable, it must be instructed to value the property on the basis of those alternative analytical methods suggested by the parties.  This procedure may seem complicated, but we are convinced that it is compelled by the Commissioner's regulations.  Hopefully, it is only the rare case where all these variables are at issue.

### B.  Constructive dividend to Green

We turn to the second question presented by this appeal:  was the district court correct in holding that George Gardiner Green, a shareholder, member of the board of directors, and President of Central, realized no dividend on the sale of corporate property to his nonshareholder children in exact proportion to his own holdings in Central?  Green, of course, says yes; the Government says no. We agree with the Government.

Sections 316(a) and 301(c) (1) of the Code require a corporate shareholder to include dividends in gross income. Dividends may be in cash or in kind, and may also result when the corporation makes a "bargain sale" of its property to the shareholder at less than fair market value.  When there is a "bargain sale", the shareholder receives a dividend in the amount of the difference between fair market value and the price paid for the corporate property, assuming there are sufficient earnings and profits; "a sale, if for substantially less than the value of the property sold, may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend".  Palmer v. Commissioner, 1937, 302 U.S. 63, 69, 58 S.Ct. 67, 70, 82 L.Ed. 50.

It is also settled that a dividend does not escape taxation "simply because it fails to pass through the hands of the particular taxpayer when . . .  the dividend is diverted at the behest of the shareholder into hands of others."  Sammons v. United States, 5 Cir. 1970, 433 F.2d 728, 730.  Consequently, when a taxpayer expressly assigns his dividend to another the assignor enjoys control of the dividend income and it is taxed to the assignor.

As the Government points out, and logic compels, the assignment principle has been extended to cover situations where a would-be dividend assignor has a controlling interest in the dividend-paying corporation and has effective power to direct the flow of corporate wealth to another, without routing the transaction through his own hands. Sammons, supra; Commissioner v. Gordon, 1968, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448; Byers v. Commissioner, 8 Cir. 1952, 199 F.2d 273, cert. den., 1953, 345 U.S. 907, 73 S.Ct. 646, 97 L.Ed. 1343. Green concedes he has no quarrel with this principle.

---

7.  In this two step process of proof, the taxpayer must bear the burden of persuading the finder of fact of the reasonable reliability of the non-analytical method of appraisal for which he contends. He may meet his burden of coming forward with the evidence—not to be confused with the burden of persuasion—by introducing satisfactory proof that prior sales or appraisals have taken place. The burden of coming forward with evidence to dispute the reliability of such prior sales or appraisals may then shift to the Government, but it is the taxpayer who continues to bear the risk of failing to persuade the finder of fact of the reasonable reliability of his own method.

Once a method of appraisal is determined, the taxpayer bears the burden of persuading the finder both (a) that the Commissioner's valuation in accordance with the chosen method is incorrect and (b) that the taxpayer's own valuation is correct, should the taxpayer seek to contest the precise valuation arrived at by the Commissioner.  See, e. g., Alvary v. United States, 2 Cir. 1962, 302 F.2d 790, 795 and cases cited.

420

The question presented today is what degree of control over corporate actions will justify constructive dividend treatment of a shareholder, in the manner of the cases cited. Tempted as we are to embrace a "bright line" rule, ability to divert a dividend or a bargain sale to one's chosen recipient must, we think, mean something short of absolute legal control. It must mean something less than a shareholder having the legal "right" to purchase corporate property at a reduced price or to compel the payment of income to himself or another; something less than a shareholder having the legal "power" to control corporate actions. To conclude otherwise would invite an epidemic of intracorporate logrolling. Influential minority shareholders, hiding behind their lack of a right to buy corporate assets and their lack of outright voting control, could shift federal tax burdens within their respective families on all income, otherwise payable as dividends, accruing to small closely-held corporations in which they owned shares.[8]

■ It is incumbent upon us to formulate a practical standard for evaluating control over the disposition of corporate assets through bargain sale or cash dividend—a standard recognizing that those who wish corporate transactions to serve their own financial needs

do not require absolute control or legally binding powers to achieve their ends. We hold that the appropriate test for determining control over corporate action, in the present context, is whether the taxpayer has exercised substantial influence over the corporate action whose tax consequences are at issue. The inquiry is factual, and when a jury is convened to find the facts, the inquiry is one for the jury, unless the evidence is insufficient for the jury or the parties stipulate to have this fact found by the Court.

■ The finder of fact must consider all the circumstances surrounding the transaction, including but not limited to the extent of the taxpayer's shareholdings in the corporation alleged to have diverted corporate resources at his behest; the taxpayer's relation to the corporation, as officer or director; the identity of the recipient of the corporate benefit, the recipient's own relation to the corporation (if any), and other circumstances tending to reveal the degree to which the taxpayer links corporation to recipient; and such evidence of the origins of the transaction as may be available. We emphasize that the finder of fact must also be allowed to consider, for what he thinks it is worth, that the corporation did in fact consummate a transaction with favorable consequences

8. Indeed, in the present case there was strong evidence of reciprocal backscratching. Robert C. Hynson was present at the meeting of the Board of Directors of Central when the conveyance of the remainder interests was approved. On Central's 1965 tax return, Hynson is listed as a vice-president of the corporation at a salary of 4800 dollars per year. At the trial, Green mentioned a sale to a trust for Hynson's children as one of the "other instances similar to mine" of a sale of remainder interests to those who did not own stock in Central Oil:

"Mr. Hynson, I believe, had an interest and his two children had a trust left to them under the will and he felt the same as I did, we were older and we didn't want any long term investments so the trust requested of the officers that they be permitted to buy and the officers saw fit to go along with their

wishes and the interest was sold to the trust".

It also appears from the record that stockholders Chisholm and Exnicios did not purchase the interests they would have been offered by virtue of their shareholdings. Their interests were, according to Green's own testimony, purchased by their children. We note that "A. F. Chisholm" was among the directors present at the meeting authorizing the sale of remainder interests.

Our task in unravelling the various purchasers and their relation to the corporation is more difficult than it should be because the Government failed to put in evidence a list of Central stockholders. Nevertheless, we think Green's testimony and the other documentary evidence clearly indicate cooperation for mutual advantage.

for the taxpayer personally or for his immediate family; this circumstance is surely one tending to prove that the taxpayer exercised substantial influence over corporate action.

The approach suggested is entirely consistent with the *Gordon, Sammons,* and *Byers* cases, *supra.* Only in the most extraordinary circumstances—not presented in any of those cases—would it be possible to conclude that a controlling shareholder of a corporation had not exercised substantial influence in causing a diversion of corporate assets in his own favor or in favor of a member of his family. We also believe that the "substantial influence" approach is fully compatible with the holding of the Tax Court in Estate of Francis D. Hodgkins v. Commissioner, T.C.Mem. 1965–255 (1965). In *Hodgkins,* the Service attempted to tax Mrs. Hodgkins, who owned 44% of the stock of the corporation in question, for amounts paid to her children as non-pro rata dividends. Mrs. Hodgkins' divorced husband owned more than 50% of the stock of the corporation, and the children were themselves minority shareholders. The Tax Court held for Mrs. Hodgkins, reasoning that there was no basis for concluding that Mrs. Hodgkins rather than her husband had been responsible for the lopsided payments to the children. The Tax Court also noted the "established principle" that "a dividend need not be divided among all the stockholders".

We read *Hodgkins* as no more than a holding that, on its own facts, Mrs. Hodgkins had not exercised substantial influence over payment of a non-pro rata dividend to her children. Mr. Hodgkins, who was in a position to control directly the actions of the corporation, was a more plausible cause of the corporate action; and the children's own shareholdings raised doubt that either Mr. *or* Mrs. Hodgkins was responsible for payments to the children. *Hodgkins* does not hold, as the district court thought, that a controlling corporate interest or an unquestioned power to compel payment of income is a prerequisite to constructive dividend treatment of a shareholder in accordance with *Gordon, Sammons* and *Byers.*

██ Applying the test articulated above to the record before us, we conclude that no reasonable inference is possible except that George Gardiner Green exercised significant influence over the sale of corporate assets to his children. Green was the President of Central, and when acting as a director he presided over the other directors of the corporation. He was therefore in a key position to exercise great influence over sales of corporate property simply by virtue of his corporate office and membership on the board. The recipients of the alleged bargain sale were Green's children, two of whom were minors at the time of the sale. Most important of all, Green's children were not shareholders of the Central Oil Company and they were strangers to the company save for their connection to it through their father and mother. We would truly have to close our eyes to what all others can see in order to avoid the conclusion that Green was a significant and intentional causative factor in Central's decision to sell its property to Green's children and the trusts created for them.

For the reasons stated, the judgment of the district court absolving George Gardiner Green of tax liability for dividends realized on bargain sales of Central property to his children or to trusts created for their benefit is reversed. The judgment of the district court as to valuation of the remainder interests sold by Central is vacated and the cause remanded for further proceedings consistent with this opinion.