MARCUS W. MELVIN AND MARILYN E. MELVIN,
PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

MARCUS W. MELVIN, M.D., P.C., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9325-83, 9451-83.      Filed January 12, 1987.

*Kevin P. O'Connell* and *Ted A. Johnson*, for the petitioners.

*Randall E. Heath*, for the respondent.

### OPINION

SWIFT, *Judge*: In timely statutory notices of deficiency, and in an amended answer in docket No. 9325-83, respondent determined deficiencies in petitioners' Federal income tax liabilities, as follows:

| Petitioners | Taxable year ending— | Deficiency |
|---|---|---|
| Marcus W. and Marilyn E. Melvin— docket No. 9325-83 | Dec. 31, 1979 | $21,340 |
| Marcus W. Melvin, M.D., P.C.— docket No. 9451-83 | June 30, 1979 | 744 |

The issues for decision are: (1) The extent to which petitioner Marcus W. Melvin was at risk under section 465[1]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

with respect to a recourse obligation of a limited partnership; (2) whether the individual petitioners herein properly may be charged with additional income with respect to their personal use of automobiles owned by the corporate petitioner herein; and (3) whether the corporate petitioner is entitled to deduct its cost of providing the automobiles for the personal use of petitioners Marcus W. Melvin and Marilyn E. Melvin.

These cases were consolidated for trial, briefing, and opinion. All of the facts have been stipulated, and these cases were submitted under Rule 122, Tax Court Rules of Practice and Procedure. The pertinent facts are summarized below.

Marcus W. Melvin and Marilyn E. Melvin are husband and wife and resided in Portland, Oregon, at the time of filing their petition in docket No. 9325-83. Marcus operates a medical practice through a professional corporation organized under the laws of Oregon, entitled "Marcus W. Melvin, M.D., P.C." At the time it filed its petition herein, the corporation's office was located in Portland, Oregon. Marcus and Marilyn are officers and employees of the professional corporation, and Marcus also is the sole shareholder and director thereof.

In 1979, Marcus and his brother, Kenneth E. Melvin, formed a general partnership, under the laws of Oregon, by the name of Medici Film Partners (Medici). The purpose of the partnership was to invest in motion pictures. Marcus owned a 71.4286-percent interest in Medici, and Kenneth owned a 28.5714-percent interest in Medici. Profits and losses of Medici were allocated between Marcus and Kenneth on the basis of their respective partnership interests. Marcus contributed $25,000 in cash, and Kenneth contributed $10,000 in cash to Medici, upon its formation.

In December of 1979, Medici entered into a subscription agreement with ACG Motion Picture Investment Fund (ACG), a California limited partnership, under which it agreed to purchase a 0.872466-percent limited partnership interest in ACG. ACG was one of several limited partnerships organized by an individual named "Michael Leone" to acquire and distribute motion pictures. Michael Leone and American Cinema Group, Inc., were the general partners of

ACG. A total of 73 limited partners invested in ACG. The limited partnership agreement of ACG provided that all rights and responsibilities of the general and limited partners of ACG would be governed by California law.

The purchase price agreed to by Medici for its interest in ACG was $105,000, to be paid by a $35,000 cash downpayment and a deferred capital contribution reflected by a $70,000 recourse promissory note. Medici paid the downpayment and gave to ACG the $70,000 promissory note called for in the subscription agreement. The $70,000 promissory note bore simple interest at 9 percent per annum, and principal payments were due thereon by Medici in five equal annual installments of $14,000, plus interest, the first of which was due in 1981.

As a general partner of Medici, Marcus' share of the $35,000 cash downpayment paid by Medici to ACG was $25,000, and his share of the $70,000 recourse promissory note Medici gave to ACG under the subscription agreement was $50,000. Because of the general partnership interest Marcus owned in Medici and the limited partnership interest Medici owned in ACG, the effective share of the profits and losses of ACG to which Marcus was entitled was 0.6232 percent and, for purposes of the issues in this case, Marcus may be treated as a limited partner of ACG.

With regard to each limited partner's recourse obligation to pay the cash downpayment and the deferred capital contributions due under the subscription agreement, the ACG partnership agreement provided as follows:

6.1 Capital Contributions of Limited Partners. * * * Payment of the capital contribution shall be made as follows: $50,000, or a fraction or multiple thereof according to the number of Interests or fractions thereof purchased, by certified, cashier's or bank check upon execution and delivery of the Subscription Agreement, together with the delivery of a promissory note for $100,000, or multiple or fraction thereof in accordance with the number of Interests or fractions thereof purchased, in favor of the Partnership, bearing interest at 9% per annum, payable over 60 months in five equal annual installments.

Also with regard to the deferred capital contributions and the limited liability of the limited partners for the debt obligations of the partnership, the ACG partnership agreement provided as follows:

6.3 Limited Liability. A limited partner shall not be bound by, or personally liable for, any expenses, liabilities or obligations of the Partnership, except as provided in the Act. No Limited Partner shall be required or obligated by the Partnership or any Partner to make further capital contributions of any kind whatsoever to the capital of the Partnership beyond those for which he is obligated pursuant to Section 6.1 hereof * * *

and

10.1 No Limited Partner shall be personally liable for any of the debts of the Partnership or any of the losses thereof, *however, the amount committed by him to the capital of the Partnership and his interest in Partnership assets shall be subject to liability therefor.* * * * [Emphasis added.]

On or about December 14, 1979, ACG obtained a $3,500,000 recourse loan from the London Branch of the First National Bank of Chicago. Simple interest accrued on the bank loan at a floating market rate,[2] and the principal amount of the loan was payable in full on or before December 14, 1981. Interest payments were due quarterly. As security for the $3,500,000 loan, ACG pledged to the First National Bank of Chicago substantially all of its assets, including the recourse promissory notes it had received from its limited partners reflecting their respective obligations to make the deferred capital contributions. The combined face amount of the promissory notes of the limited partners that ACG pledged to the bank as collateral on the $3,500,000 bank loan totaled $8,023,400. Medici's $70,000 promissory note to ACG was among those notes that were pledged as collateral on the bank loan.

The loan agreement between ACG and the bank specified that the recourse promissory notes of the limited partners of ACG (reflecting the limited partners' obligations to make deferred capital contributions) were to be physically transferred to the bank in order to protect the bank's security interest in the notes. The relevant language from the loan agreement provided as follows:

(1) The Promissory Notes shall be deposited with the Bank or at such other place as shall be designated by the Bank and held, in either case, to the sole order of the Bank. Without in any way reducing, affecting or

---

[2]The interest rate on the bank loan was two percentage points over the rate paid by the First National Bank of Chicago to other banks on U.S. dollar deposits at its London Branch.

derogating from the Charge hereby created in favour of the Bank, the parties acknowledge that the Bank shall in its absolute discretion and without reducing or affecting its other rights hereunder, be entitled to direct Limited Partners to make payments as they fall due under the Promissory Notes to ACG 1979 and not to the Bank, if the Charge shall at the time of such payment be then valid and existing.

On December 31, 1979, ACG agreed to purchase from American Cinema Productions, Inc., a feature-length motion picture entitled "The Octagon." The purchase price of $9 million for the film was to be paid by ACG with a $3,500,000 cash downpayment and a $5,500,000 nonrecourse promissory note bearing simple interest at 10 percent per annum. ACG paid the $3,500,000 cash downpayment out of the proceeds of the loan from the First National Bank of Chicago.

During the 1979 short taxable year of ACG, beginning June 5, 1979, and ending December 31, 1979, ACG incurred a net operating loss of $12,515,318.

During the years at issue herein, the individual petitioners used for personal purposes automobiles owned by the corporate petitioner, Marcus W. Melvin, M.D., P.C. The corporation owned three automobiles. From July 1, 1978, until January of 1979, it owned a 1975 Datsun and a 1978 Jaguar. The Datsun was acquired by the corporation in 1975 for a price of $7,493. The Jaguar was acquired by the corporation in May of 1978 for $21,773.

In January of 1979, the Datsun was sold, and the corporation acquired a 1979 BMW for $15,813. During the corporation's 1979 taxable year, the Datsun and (after the Datsun was sold in January 1979) the BMW were driven exclusively by Marilyn and her use thereof was primarily for personal purposes. The Jaguar was driven exclusively by Marcus and his use thereof was primarily for business purposes. The parties have agreed as to the total miles the three automobiles were driven during the corporation's 1979 taxable year and as to the allocation thereof between personal and business use of the automobiles, as follows:

|  | Business use | | Personal use | | |
|---|---|---|---|---|---|
|  | Miles | Percent | Miles | Percent | Total miles |
| Jaguar | 1,383 | 67 | 681 | 33 | 2,064 |
| Datsun and BMW (combined) | 1,120 | 20 | 4,480 | 80 | 5,600 |
| Total for both automobiles | 2,503 | 33 | 5,161 | 67 | 7,664 |

Marcus and Marilyn did not personally own any automobiles during 1978 and 1979, and the mileage figures reflected in the above schedule reflect total miles driven by Marcus and Marilyn during the relevant time period.

Pursuant to an agreement between the corporation and Marcus and Marilyn, for each mile of personal use of the corporate automobiles, Marcus and Marilyn were to reimburse the corporation $0.17. The reimbursement rate was based upon the mileage reimbursement rate reflected in Rev. Rul. 77-410, 1977-2 C.B. 85. At the $0.17 rate, the reimbursement to the corporation for the personal use of the corporate automobiles during the corporation's 1979 taxable year should have been $877.37 ($0.17 times 5,161 equals $877.37). In fact, Marcus and Marilyn reimbursed the corporation $1,302 for their personal use of the corporate automobiles.[3]

Marcus and Marilyn continued to use the corporate automobiles for both personal and business purposes during the period July 1, 1979, through December 31, 1979. The parties agree that the total miles the automobiles were driven during that period and the allocation between their personal and business use thereof were the same as they were for the first six months of the prior taxable year of the corporation. Thus, the parties have stipulated that we can disregard herein whatever slight differences may have existed in the use of the automobiles between the taxable year of the corporation ending June 30, 1979, and the calendar year of Marcus and Marilyn ending December 31, 1979.

On their 1979 joint Federal income tax returns, Marcus and Marilyn claimed a loss with respect to Marcus' investment in ACG (through Medici) of $75,000, representing Marcus' claimed at-risk amount of $75,000 (i.e., his $25,000 cash contribution to Medici and his $50,000 share of the recourse promissory note issued by Medici to ACG that was pledged by ACG as collateral to obtain the $3,500,000 bank loan). Also, Marcus and Marilyn did not report on their 1979 joint Federal income tax return income attributable to their personal use of the corporate automobiles.

---

[3]The record does not explain why the actual reimbursement exceeded that called for pursuant to the agreed-upon reimbursement rate of $0.17 per mile.

In his notice of deficiency to petitioners Marcus and Marilyn Melvin, respondent determined that the total fair rental value of the personal use of the corporate automobiles by Marcus and Marilyn in calendar year 1979 was $4,012, and respondent charged Marcus and Marilyn with $4,012 in additional dividend income. Respondent did not allow petitioners to offset the amount of the dividend income by the amount of the $1,302 reimbursement Marcus and Marilyn paid to the corporation in 1979. The parties now stipulate that the value determined by respondent to reflect the personal use of the corporate automobiles by Marcus and Marilyn accurately reflects the fair market rental value of such personal use. In his notice of deficiency to petitioner Marcus W. Melvin, M.D., P.C., respondent disallowed a deduction to the corporation for the $4,012 that he had determined was the cost of maintaining the automobiles attributable to the personal use thereof by Marcus and Marilyn.

In his notice of deficiency to petitioners Marcus and Marilyn Melvin, respondent did not question the loss with respect to ACG claimed on Marcus' and Marilyn's 1979 joint Federal income tax return. Respondent, however, filed an amended answer herein in which he asserts that as of December 31, 1979, Marcus' at-risk amount with respect to his investment (through Medici) in ACG was limited to Marcus' $25,000 cash contribution to Medici and that Marcus was not at risk with respect to any portion of the $3,500,000 bank loan. In a supplemental memorandum filed with the Court on December 16, 1986, respondent concedes that Marcus' at-risk amount with respect to his investment in ACG includes his pro rata share of the $3,500,000 bank loan. In making such concession, however, respondent does not concede any of the arguments made on brief to the extent those arguments are applicable to the at-risk issue with respect to the portion of the $3,500,000 bank loan in excess of Marcus' pro rata share thereof.

### At-Risk Issue

Where an individual invests in motion picture films or television videotapes, section 465, among other things, provides that any loss from such investments shall be

allowed only to the extent the taxpayer is at risk with respect to the activity at the close of the taxable year. Sec. 465(a)(1); sec. 465(c)(1)(A).[4] Included in the amount for which a taxpayer is considered at risk are amounts of cash contributed by the taxpayer and amounts borrowed with respect to the activity. Sec. 465(b)(1). For a taxpayer to be considered at risk with respect to borrowed amounts, however, among other requirements, the amounts must have been borrowed for use in the activity, and the taxpayer must be personally liable for repayment of the borrowed amounts or have pledged property, other than property used in the activity, as security for the borrowed amounts. Sec. 465(b)(2).[5]

A further requirement on amounts with respect to which a taxpayer will be considered at risk is found in section 465(b)(4). That section provides that amounts which are "protected against loss" are not considered at risk, as follows:

SEC. 465(b). AMOUNTS CONSIDERED AT RISK.—

\* \* \* \* \* \* \*

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

Although the legislative history of section 465(b)(4) does not define specifically what is meant by the words "other similar arrangements," it does evidence concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss, even

---

[4]Sec. 465 was added to the Code by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1531, and is applicable to taxable years beginning after Dec. 31, 1975. Although sec. 465(a) makes no reference to partners or partnerships, it is clear that sec. 465 was intended to apply to partners and partnerships. See *Peters v. Commissioner*, 77 T.C. 1158, 1163 (1981). Therefore, petitioner Marcus Melvin is subject to the at-risk limitations of sec. 465 with respect to his investment in ACG through Medici.

[5]Sec. 465(b)(2) provides as follows:

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to. the extent of .the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

though the underlying transaction was not profitable. Those situations include nonrecourse financing, various insurance agreements, stop loss agreements, and other arrangements for compensation or reimbursement to the taxpayer for any loss he may suffer. *Porreca v. Commissioner*, 86 T.C. 821, 838 (1986). The Senate Finance Committee report explaining the at-risk provisions states as follows:

> Also, under these rules, a taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person. [S. Rept. 94-938, at 49 (1976), 1976-3 C.B. (Vol. 3) 87; fn. ref. omitted.]

Where a taxpayer's debt obligation constitutes only a secondary liability under which the taxpayer has a right of reimbursement against the primary obligor, the taxpayer will not be treated as at risk with respect to such an obligation. The taxpayer's right of reimbursement from the primary obligor is regarded as a type of protection against loss within the meaning of section 465(b)(4). *Brand v. Commissioner*, 81 T.C. 821, 828 (1983).

The parties herein agree that Marcus was at risk within the meaning of section 465 with respect to his portion (namely, $25,000) of the $35,000 cash downpayment Medici paid to ACG. The parties also agree that Marcus was not at risk under section 465 with respect to the recourse promissory note Medici gave to ACG reflecting Medici's obligation to make additional capital contributions to ACG because that mere obligation did not result in money being contributed to the activity nor did it constitute the borrowing of money for use in the activity as required by section 465(b)(2)(A) and (B).

The disputed question herein is the extent to which Marcus is to be considered at risk under section 465 with respect to the $3,500,000 loan ACG obtained from the First National Bank of Chicago. The resolution of this issue turns on whether Marcus, as a general partner of Medici, was "personally liable" within the meaning of section

465(b)(2)(A) for repayment of the bank loan to ACG and, if so, whether and to what extent Marcus was protected against loss within the meaning of section 465(b)(4) by a right of contribution from the other limited partners of ACG.

*Personal Liability*

Petitioners argue that Marcus was personally liable for repayment of the $3,500,000 bank loan because (1) the bank would not have made the loan to ACG if it had not received as collateral therefor the security interest in Medici's recourse promissory note to ACG and in the promissory notes of the other limited partners of ACG; (2) the structure of the financing establishes that, absent repayment from the proceeds of distributing the film, the bank and ACG would look to the loan collateral (i.e., the recourse promissory notes of ACG's limited partners) for repayment of the bank loan; and (3) the limited partners were not mere guarantors of ACG's obligation to repay the bank loan, and they had no rights of reimbursement from ACG or the general partners of ACG with respect to their recourse promissory notes.

Respondent argues that Marcus (as well as the other limited partners of ACG) were not personally liable on the bank loan within the meaning of section 465(b)(2)(A) because a taxpayer's at-risk amount is determined at the end of each year, and as of the end of 1979 (the year at issue herein), Marcus had not made, and was not obligated to make, any of the payments on Medici's recourse promissory note to ACG. Respondent therefore argues that if in 1979 ACG had failed to repay the bank loan, the bank would not have been able to demand repayment thereof from Marcus (through Medici) because under the terms of Medici's note, no payments were due thereon until 1981. Thus, respondent contends that Marcus was not personally liable for repayment of any amount of the bank loan during 1979 and that Marcus' obligation with respect to the deferred capital contributions is not includable in Marcus' yearend at-risk amount. Respondent also argues that Marcus was not "economically at risk" with respect to the bank loan. For the reasons explained below, we agree with petitioners and hold that as of December 31, 1979, Marcus is to be

regarded as "personally liable" within the meaning of section 465, on the debt obligation of ACG to the bank.

Respondent correctly states that the determination of a taxpayer's amount at risk is made at the end of each taxable year of the partnership or other activity. Sec. 465(a).[6] Respondent argues therefore that a taxpayer's at-risk amount does not include amounts that a taxpayer is "required to contribute to the partnership until such time as the contribution is actually made," citing the proposed regulations under section 465.[7] As explained, however, petitioners herein do not contend that Marcus' at-risk amount increased solely by virtue of his obligation, as a general partner of Medici, to contribute additional capital to ACG in years after 1979. Rather, petitioners argue that Marcus' at-risk amount increased because Medici became personally liable on the recourse obligation of ACG to the bank when its recourse note to ACG was pledged to the bank as collateral for the bank loan.

It cannot seriously be questioned that debt obligations of a partnership that are payable in later years generally are to be included in the at-risk amounts of the partners that are personally liable therefor. Sec. 465(b)(2)(A). The proposed regulations under section 465 and final regulations under section 752 contemplate that obligations due in later years will be included in the computation of a partner's at-risk amount and in the computation of his basis. See sec. 1.465-24(a)(2), Proposed Income Tax Regs.; sec. 1.752-1(e), Income Tax Regs. Numerous cases have so held. See, e.g., *United States v. Raphan*, 759 F.2d 879 (Fed. Cir. 1985) (taxpayer's basis increased with respect to debt obligations due 6 years subsequent to the taxable years at issue);

---

[6]See S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86.

[7]Sec. 1.465-22(a), Proposed Income Tax Regs., 44 Fed. Reg. 32241 (June 5, 1979), provides as follows:

Sec. 1.465-22. Effect on amount at risk of money transactions.—(a) Money contributed to activity. A taxpayer's amount at risk in an activity shall be increased by the amount of personal funds the taxpayer contributes to the activity. For this purpose a contribution by a partner to a partnership conducting only one activity is a contribution to the activity. However, a partner's amount at risk shall not be increased by the amount which the partner is required under the partnership agreement to contribute until such time as the contribution is actually made. Neither shall a partner's amount at risk be increased in the case of a note payable to the partnership for which a partner is personally liable until such time as the proceeds of the note are actually devoted to the activity. See sec. 1.465-10 for rules relating to amounts loaned by a shareholder to an electing small business corporation. See sec. 1.465-7(a) for the treatment of a loan by a partner to the partnership.

*Abramson v. Commissioner*, 86 T.C. 360 (1986) (taxpayer's at-risk and basis amounts increased with respect to debt obligations due 10 years subsequent to the taxable years at issue). Furthermore, there is no suggestion in section 465 that debt obligations that do not mature until later years are to be excluded from the taxpayer's at-risk amount.

Our recent opinion in *Pritchett v. Commissioner*, 85 T.C. 580 (1985), on appeal (9th Cir., May 2, 1986), does not stand for a contrary result. In *Pritchett*, limited partners made initial cash contributions to a partnership and agreed to make additional cash contributions in later years if called upon to do so by the general partners in order to repay a recourse loan extended to the partnership. We determined in *Pritchett* that the limited partners were not at risk with respect to their contingent cash call obligations. The loan did not accrue interest and no payments of principal were due on the loan for 15 years. See sec. 465(b)(3). In sum, the alleged recourse debt obligations of the limited partners to make additional cash contributions were not definite and fixed and were tainted by the non-arm's-length nature of the underlying partnership loan.[8] In the instant case, the limited partners' obligations to make additional capital contributions to ACG were definite and fixed, and ACG negotiated the bank loan at arm's length. Although Medici's note to ACG was not payable in 1979, the year in issue, it does not follow that Medici lacked personal liability on the bank loan in 1979.

In contending that Marcus was not personally liable on the bank loan, respondent also argues that Marcus and the other limited partners of ACG were not "economically at risk" with respect to the debt obligation of ACG to the bank. Although respondent does not elaborate upon this argument on brief, he apparently contends that the limited partners' obligations with respect to the bank loan were

---

[8]The proposed regulations under sec. 465 provide that the substance, and not the form, of alleged at-risk obligations that arise within the context of non-arm's-length loans will control. Sec. 1.465-1(b), Proposed Income Tax Regs., 44 Fed. Reg. 32237 (June 5, 1979), provides, in part, as follows:

Sec. 1.465-1. General rules; limitation of deductions to amount as risk.—

(b) Substance over form. In applying section 465 and these regulations, substance will prevail over form. Regardless of the form a transaction may take, the taxpayer's amount at risk will not be increased if the transaction is inconsistent with normal commercial practices or is, in essence, a device to avoid section 465. * * *

secondary to the primary obligations of ACG and the general partners of ACG with respect thereto.

Recent cases establish that with respect to a particular debt obligation, a partner will be regarded as personally liable within the meaning of section 752 (for basis purposes) and section 465(b)(2)(A) (for at-risk purposes) if he has the ultimate liability to repay the debt obligation of the partnership in the event funds from the partnership's business and investments are not available for that purpose. *United States v. Raphan*, 759 F.2d 879, 886 (Fed. Cir. 1985); *Gefen v. Commissioner*, 87 T.C. 1471 (1986); *Abramson v. Commissioner*, 86 T.C. 360, 375-376 (1986); *Smith v. Commissioner*, 84 T.C. 889, 907-908 (1985), affd. without published opinion 805 F.2d 1073 (D.C. Cir. 1986).

The relevant question is who, if anyone, will ultimately be obligated to pay the partnership's recourse obligations if the partnership is unable to do so. It is not relevant that the partnership *may* be able to do so. The scenario that controls is the worst-case scenario, not the best case. Furthermore, the fact that the partnership or other partners remain in the "chain of liability" should not detract from the at-risk amount of the parties who do have the ultimate liability. The critical inquiry should be who is the obligor of last resort, and in determining who has the ultimate economic responsibility for the loan, the substance of the transaction controls. *United States v. Raphan, supra* at 885.[9]

Of interest to our resolution of this question is the direction given to the Treasury by Congress in the Deficit Reduction Act of 1984, in response to the decision of the Claims Court in *Raphan v. United States*, 3 Cl. Ct. 457 (1983). In *Raphan*,[10] the Claims Court made a determination

---

[9]This also is the test reflected in Treasury's proposed regulations under sec. 465 for at-risk purposes (see sec. 1.465-24(a)(2), Proposed Income Tax Regs., the text of which is set forth in note 12, *infra*) and in final regulations under sec. 707 (see sec. 1.707-1(a), Income Tax Regs.).

[10]The Claims Court in *Raphan* held that because none of the partners was personally liable on a partnership debt obligation, each limited partner was allowed to increase his basis in his investment in the partnership by his pro rata share of the partnership debt. The Claims Court treated the liability of the general partner under his "guarantee" of the partnership debt as a secondary liability since the word "guarantee" generally connotes a secondary liability vis-a-vis the primary obligor. *Raphan v. United States*, 3 Cl. Ct. 457, 465-466 (1983). The Court of Appeals for the Federal Circuit reversed the Claims Court and held that in spite of the use by the parties of the term "guarantor," the general partner was personally liable for the partnership debt because he ultimately was liable therefor. *United States v. Raphan*, 759 F.2d 879, 886 (Fed. Cir. 1986).

of liability, or lack thereof, based primarily on the form of the transaction and on certain labels used by the parties to the transaction. In response to the Claims Court decision in *Raphan*, in 1984 Congress specifically directed the Treasury to promulgate regulations under section 752 to consider the substance, and not merely the form, of financing, and particularly to consider current commercial lending practices with respect to guarantees, assumptions, and indemnities. Sec. 79, Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 597; H. Rept. 98-861, at 869 (Conf. 1984), 1984-3 C.B. (Vol. 2) 123. We also believe it appropriate herein to take into account the substance and realities of the financing arrangements presented to us.

With the above standards in mind, our careful analysis of the financing in question in this case leads us to conclude that Marcus and the other limited partners of ACG were ultimately and personally liable for repayment of the $3,500,000 loan ACG obtained from the First National Bank of Chicago. The terms of the loan reflected arm's-length financing. Interest accrued on the unpaid balance of the loan at a market rate. Unpaid principal was due in 2 years. The creditor was an unrelated, third-party financial institution. If proceeds from the distribution of films owned by ACG were not sufficient to repay the bank (which, as explained, is the "worst-case" assumption we must make in our analysis herein), the bank would have direct access to (1) other assets of ACG or its general partners, or (2) the assets of ACG's limited partners up to the amount of the balance due under their respective recourse obligations to contribute additional capital to ACG, as reflected by the promissory notes of the limited partners which had been pledged to the bank.

If ACG's assets were not available to repay the bank and the bank proceeded first against the general partners of ACG (as the *nominal* primary obligors on the bank loan), it is clear that under the structure of the financing involved in this case, the general partners would not bear the economic cost thereof because they would look to the deferred capital contributions of the limited partners from which they would be fully reimbursed. Clearly, the deferred capital contributions were to serve as the ultimate source of the proceeds

for repayment of the bank loan if the partnership did not have the funds to do so. To hold otherwise would ignore the substance and reality of the financing structure before us.

Furthermore, and critical to this analysis, if the bank proceeded directly against the limited partners to collect the loan, the limited partners would have no right of reimbursement from ACG or its general partners with respect to amounts the limited partners paid to the bank because any such payments would be based on the independent, fixed, and definite recourse obligations of the limited partners to make the deferred capital contributions to ACG.

For the reasons stated above, we conclude that Marcus was personally liable on the bank loan to ACG up to the amount of his obligation to contribute additional capital to the partnership.

*Protection Against Loss*

Respondent argues that even if Marcus may be regarded as personally liable on the bank loan within the meaning of section 465(b)(2), if Marcus were required to pay the bank an amount that exceeded his pro rata share of the total bank loan, Marcus would have a right of reimbursement from the other limited partners of ACG for any such excess payment. Respondent therefore argues that with respect to Marcus' potential liability to pay the bank an amount in excess of his pro rata share of the bank loan, Marcus should be treated as being protected against economic loss under section 465(b)(4).[11]

Respondent's argument is based on California partnership law under which limited partners, who are required to pay partnership obligations in amounts exceeding their pro rata share thereof, are entitled to contribution or reimbursement from the other limited partners for the excess payments. See Cal. Corp. Code sec. 15040(f) (West 1986); *Stodd v. Goldberger*, 73 Cal. App. 3d 827, 141 Cal. Rptr. 67, 73 (1977); *Burstein v. Zelman*, 182 Cal. App. 2d 1, 5 Cal. Rptr. 829, 830 (1960); *Caldwell v. Richards*, 91 Cal. App. 428, 267 P. 127 (1928).

Petitioners counter that under California partnership law, creditors of an insolvent limited partnership can enforce

---

[11]The text of sec. 465(b)(4), is found at page 70 *supra*.

payment of a partnership debt obligation against all limited partners to the full extent of their respective deferred capital contributions (see Cal. Corp. Code sec. 15517(l) (West 1986); *Donroy Ltd. v. United States*, 196 F. Supp. 54 (N.D. Cal. 1961), affd. 301 F.2d 200 (9th Cir. 1962); *Engleman v. Malchow*, 91 Cal. App. 2d 341, 205 P.2d 413 (1949)), and petitioners argue that any rights of reimbursement as between limited partners are only prospective or potential in nature and are not reflected in a binding agreement between the limited partners of ACG.

We find petitioners' argument unpersuasive. As previously explained, the test of whether a taxpayer is protected against loss with respect to amounts otherwise at risk is whether the protection (such as a right of reimbursement) is definite and fixed, not whether any payment as a result of the protection is immediate versus prospective. The manner by which the protection is established (whether by binding agreement between the parties or by state law) is not controlling.[12]

In light of the above analysis, we conclude that Marcus was protected against loss within the meaning of section 465(b)(4) with respect to his personal liability on the bank loan for amounts that exceed his pro rata share of the bank loan (namely, $21,812[13]). We emphasize that the definite

---

[12]Sec. 1.465-24(a), Proposed Income Tax Regs., 44 Fed. Reg. 32242 (June 5, 1979), addresses this situation as follows:

Sec. 1.465-24. Effect on amount at risk of loans for which borrower is personally liable for repayment.—(a) *Creation of loan*—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(2) *Partnerships*. (i) When a partnership incurs a liability in the conduct of an activity and under state law members of the partnership may be held personally liable for repayment of the liability, each partner's amount at risk is increased to the extent the partner is not protected against loss. To the extent the partner is protected against loss (such as through a right of contribution), the liability shall be treated in the same manner as amounts borrowed for which the taxpayer has no personal liability and for which no security is pledged. See sec. 1.465-25.
   (ii) The application of this paragraph may be illustrated by the following example:

*Example*. A and B are equal general partners in partnership AB, which is engaged solely in an activity described in section 465(c)(1). AB borrows $25,000 from a bank to purchase equipment to be used in the activity. In addition to giving the bank a security interest in the newly purchased equipment, A and B each assumes personal liability for the loan. Although either A or B could be called upon by the bank to repay the entire $25,000, in such instance the partner who paid would be entitled to $12,500 from the other partner. Thus, although each is personally liable for $25,000, each is protected against loss in excess of $12,500. Accordingly, the loan increases the amount each is at risk with respect to the activity by $12,500.

[13]0.6232 percent of $3,500,000 equals $21,812.

and fixed recourse obligations of the other limited partners of ACG to contribute additional capital thereto support our conclusion on this issue. Clearly, it was not contemplated that Marcus ever would have to pay an amount with respect to the bank loan in excess of his pro rata share thereof.

In summary, we conclude that Marcus was at risk within the meaning of section 465(b) with respect to $21,812 of the $3,500,000 loan ACG obtained from the First National Bank of Chicago. He was personally liable therefor and with respect to that amount he was not protected against loss. When added to the $25,000 cash downpayment, Marcus' total at-risk amount with respect to his investment in Medici was $46,812.

### Personal Use of Corporate Automobiles

Numerous court opinions establish that if shareholders of a corporation use corporate-owned property for personal purposes, they will be charged with additional distributions from the corporation, taxable to them as constructive dividend income if the corporation has sufficient earnings and profits. *Ireland v. United States*, 621 F.2d 731, 735 (5th Cir. 1980); *Loftin and Woodard, Inc. v. United States*, 577 F.2d 1206, 1214 (5th Cir. 1978); *Commissioner v. Riss*, 374 F.2d 161, 166-167 (8th Cir. 1967); *Challenge Mfg. Co. v. Commissioner*, 37 T.C. 650, 663 (1962); *American Properties, Inc. v. Commissioner*, 28 T.C. 1100, 1115 (1957), affd. 262 F.2d 150 (9th Cir. 1958). In addition, the corporation will not be allowed to deduct costs of owning property that are attributable to personal use of the property by its shareholders. *United Aniline Co. v. Commissioner*, 316 F.2d 701, 705 (1st Cir. 1963); *Challenge Mfg. Co. v. Commissioner*, *supra* at 663.

If employees of a corporation use corporate property in their capacity as such, they will be charged with additional income in the form of constructive wages or salary, and the corporation will be entitled to a deduction with respect thereto. Secs. 61(a)(1), 162(a)(1). [14] Whether personal use of corporate property constitutes constructive dividends, con-

---

[14]See *Levy v. Commissioner*, T.C. Memo. 1984-306.

structive wages, or something else (such as a gift, repayment of a loan, or payment for property purchased) is a question of fact. *Loftin & Woodard, Inc. v. United States, supra* at 1242; *Goldstein v. Commissioner,* 298 F.2d 562, 566 (9th Cir. 1962); *Lengsfield v. Commissioner,* 241 F.2d 508, 510 (5th Cir. 1957). The corporation has the burden of establishing that the personal use of corporate property constitutes additional wages or compensation. *Motel Co. v. Commissioner,* 340 F.2d 445, 449 (2d Cir. 1965).

Perhaps the most difficult question raised by adjustments relating to the personal use of corporate property pertains to the method of valuing the benefit to the shareholders or employees. Section 301(b) expressly provides that the amount of corporate distributions of property should be the "fair market value" of the property. [15]   See also sec. 1.301-1(j), Income Tax Regs. Many courts, however, occasionally at the urging of the Government, adopt a "cost" analysis for determining the value to shareholders or employees of their personal use of corporate property. See *Ireland v. United States,* 621 F.2d 731, 737 (5th Cir. 1980); *Commissioner v. Riss, supra* at 168-169; *United Aniline Co. v. Commissioner, supra* at 704-705; *Estate of Runnels v. Commissioner,* 54 T.C. 762, 767 (1970).

In discussing a number of the cases which use "cost" as the measure of the benefit conferred upon the shareholders or employees, the Fifth Circuit in *Loftin & Woodard, Inc. v. United States, supra* at 1222-1227, concluded that—

> The cases supporting the use of cost stand for the proposition that cost is an *acceptable* measure of value when there is no credible evidence of fair market value or when evidence of fair market value exists but is cleary rebutted. * * *
>
> In sum, value is the overriding concept in the measurement of a constructive dividend. * * *
>
> [Emphasis in original.]

Other cases illustrating the preference for the use of fair market value, particularly fair "rental" value, in valuing the personal use of corporate property are as follows: *Ireland v.*

---

[15]Sec. 301(b) provides, in part, as follows:

SEC. 301(b). AMOUNT DISTRIBUTED.—

    (1) GENERAL RULE.—For purposes of this section, the amount of any distribution shall be—

        (A) NONCORPORATE DISTRIBUTEES.—If the shareholder is not a corporation, the amount of money received, plus the fair market value of the other property received.

*United States, supra* at 739; *Dole v. Commissioner*, 43 T.C. 697, 705 (1965) (Court-reviewed), affd. per curiam 351 F.2d 308 (lst Cir. 1965); *Challenge Mfg. Co. v. Commissioner, supra* at 663; *Dean v. Commissioner,* 9 T.C. 256, 267 (1947), affd. 187 F.2d 1019 (3d Cir. 1951).[16]

In applying the above principles to the stipulated facts presented in this case, we must agree with respondent's adjustments relating to the personal use by Marcus and Marilyn of the corporate automobiles.

Petitioners argue primarily that the reimbursement procedure they established (utilizing figures reflected in Rev. Rul. 77-410) fully or at least adequately compensated the corporation for the personal use by Marcus and Marilyn of the automobiles. The amounts of the reimbursements were geared to the costs or estimated costs of the corporation in providing the corporate automobiles to Marcus and Marilyn. As we have stated, where the value of the personal benefit conferred on shareholders or employees is known or is agreed to, such value controls. In light of the stipulation herein that the value of the personal use of the automobiles exceeded the amount of the reimbursements, the difference between the stipulated value of the personal use of the corporate automobiles (namely, $4,012) and the total reimbursement paid to the corporation (namely, $1,302) constitutes additional income to Marcus and Marilyn.

Petitioners have failed to satisfy their burden of proving that the value of the personal use of the automobiles constituted additional wages or compensation, and we therefore conclude that such value, less reimbursements, constituted a constructive dividend that is taxable to Marcus under section 301 as the sole shareholder of the corporation. This result is not altered simply because Marilyn was not a shareholder of the corporation. Marcus had complete control over the corporation, and he is taxable on the constructive dividend because Marilyn (who was not a shareholder) benefited from the personal use of the corporate property. See *Green v. United States*, 460 F.2d 412, 419 (5th Cir. 1972).

---

[16]See also *Levy v. Commissioner*, T.C. Memo. 1984-306; *Chandler v. Commissioner*, 41 B.T.A. 165, 178 (1940); *Reynard Corp. v. Commissioner*, 30 B.T.A. 451, 453 (1934); *Frueauff v. Commissioner*, 30 B.T.A. 449, 451 (1934).

Another reason the reimbursement rate used by Marcus and Marilyn did not adequately reflect the value of their personal use of the Jaguar, the Datsun, and the BMW, is that the total mileage driven on the automobiles was extremely low. Using the reimbursement rate of $0.17 for each mile of personal use during the corporation's 1979 taxable year, petitioners should have reimbursed the corporation only $115.77 for Marcus ($0.17 x 681 personal miles), and $761.60 for Marilyn ($0.17 x 4,480 personal miles). It is beyond question that access to unlimited personal use of a new or almost new Jaguar, Datsun, and BMW (and actual personal use thereof representing 33 percent of the total use of the Jaguar and 80 percent of the total use of the Datsun and BMW) has a value significantly in excess of the amount of the total reimbursement called for under the reimbursement agreement (namely, $877.37 for both cars), and also significantly in excess of the $1,302 total actual reimbursement. This conclusion is supported by the stipulation of the parties that the fair rental value of the personal use of the three automobiles during the corporation's 1979 taxable year was $4,012.

The low personal mileage on the automobiles raises a point not argued by petitioners. Some court opinions suggest that mere incidental or insignificant personal use of corporate property will not justify a finding of a constructive dividend. See *United Aniline Co. v. Commissioner*, 316 F.2d 701, 703 (lst Cir. 1963).[17] Particularly, with respect to the use of the Jaguar, it could be argued herein that 681 miles of personal use during an entire year was insignificant. In our opinion, however, 681 miles of personal use is not insignificant in light of the total miles the Jaguar was driven. Clearly, the significance of the total personal mileage must be viewed in context with the percentage it represents of the total miles driven. It also is significant that Marcus and Marilyn had access to luxury automobiles for their personal use throughout the year at a negligible charge therefor.[18]

---

[17]See also *Gardner v. Commissioner*, T.C. Memo. 1976-349, affd. 613 F.2d 160 (6th Cir. 1980).

[18]A question raised by the facts of this case but one that is not for us to decide is how a corporation or other business can justify, from a business standpoint, the purchase of a $20,000 automobile when the automobile is driven only 1,383 business miles a year. In part,

We hold that Marcus and Marilyn are taxable on $2,710, which is the value of their personal use of the corporate automobiles in 1979, less the amount of their reimbursements to the corporation ($4,012 less $1,302 equals $2,710).[19]

As we have stated, a corporation is not entitled to deduct the costs of owning corporate property that are attributable to the personal use of the property by its shareholders. Based on this principle, respondent disallowed to petitioner-corporation herein a deduction of $4,012 with respect to personal use of its automobiles by Marcus and Marilyn. Petitioners agree that $4,012 is the appropriate measurement of cost for the personal use of the corporate automobiles. Respondent did not reduce its disallowance of the corporation's deduction by the amount of the $1,302 reimbursement from Marcus and Marilyn. Clearly, the disallowance is improper to the extent of such reimbursement.[20] We therefore hold that the costs attributable to the personal use by Marcus and Marilyn of the automobiles is disallowed to the extent the costs exceed the reimbursement paid therefor by Marcus and Marilyn. We so hold.

*Decisions will be entered under Rule 155.*

Congress addressed the tax aspects of this question in sec. 280F, enacted as part of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 713, which limited the deductions and credits taxpayers are allowed to claim with respect to luxury automobiles used in a trade or business and which are placed in service after June 18, 1984.

[19]Respondent concedes on brief that the income adjustment for the personal use of the automobiles should be reduced by the amount of reimbursement paid to the corporation by Marcus and Marilyn.

[20]If the full cost attributable to personal use of the automobiles is disallowed, the corporation will not only be taxed on such costs, but also on the reimbursement received from petitioners.